Laurence ("Laird") J. Lucas (ISB # 4733)
LAW OFFICES OF LAURENCE J. LUCAS
P.O. Box 1342
Boise, ID 83701
(208) 424-1466
llucas@rmci.net

Lauren M. Rule (ISB # 6863)
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, ID 83701
Phone: (208) 342-7024
Fax:  (208) 342-8286
lrule@rmci.net

Attorneys for the Plaintiffs Idaho Watersheds Project and
Committee for Idaho's High Desert

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO WATERSHEDS PROJECT, and COMMITTEE FOR IDAHO'S HIGH DESERT,<br><br>   Plaintiffs,<br><br>vs.<br><br>VERL JONES & TUDDIE JONES,<br><br>   Defendants. | Civil No. 00-0730-E-BLW<br><br>**PLAINTIFFS' OPENING BRIEF IN SUPPORT OF MOTION FOR AWARD OF ATTORNEY FEES AND LITIGATION EXPENSES** |

## INTRODUCTION

Plaintiffs respectfully request an award of reasonable attorney fees and litigation expenses incurred in this matter against the Jones Defendants, pursuant to the Endangered Species Act, *16 U.S.C. § 1540(g)(4)*, in the total amount of $47,804.93.

The requested award includes the prior attorney fees and litigation expenses awarded by this Court in September 2003, plus additional fees and expenses incurred by Plaintiffs following

BRIEF IN SUPPORT OF MOTION FOR ATTORNEY FEES AND EXPENSES -- 1

remand from the 9th Circuit in 2005. *See accompanying Declaration of Laird J. Lucas In Support Of Motion For Award Of Attorney Fees And Expenses* (hereafter, *"Second Lucas Fees Declaration"*).

As explained below, such an award is appropriate because Plaintiffs have served the purposes of the ESA and achieved their goals in bringing this lawsuit to protect bull trout in Otter Creek. *See Association of California Water Agencies v. Evans, 386 F.3d 879, 884-888 (9th Cir. 2004)* (plaintiffs entitled to fees under ESA when they obtained partial relief sought).

Specifically, as a result of this litigation, the Jones Defendants were enjoined from causing "take" of bull trout using the old Otter Creek diversion for the last five years; and now Plaintiffs have succeeded in requiring that the diversion must be modernized with a headgate and fish screen, to prevent fish entrainment and allow migration instream. Yet throughout this case, the Jones Defendants insisted they had every right to continue using the old diversion, claiming it posed no harms to bull trout. The Jones Defendants thus extended this litigation unnecessarily, resisting Plaintiffs' repeated efforts to settle the litigation on the same grounds that they have now achieved.

Accordingly, given the nature of the case and the outcome achieved, and given the Jones Defendants' own tactics which extended the litigation unnecessarily, an award of reasonable attorney fees and litigation expenses is warranted under the ESA.

## STATEMENT OF RELEVANT FACTS

The following discussion of the different stages of this litigation is necessary to demonstrate how Plaintiffs have prevailed in their claims, by preventing the Jones Defendants from operating the archaic Otter Creek diversion until it is modernized with a headgate and fish screen to prevent future "take" of bull trout.

**Initial Litigation in 2000-2001.**

Plaintiffs filed this action in December 2000 as a citizen suit enforcement action under the ESA, after providing the required 60-day notice letter to Defendants in October 2000. *See Complaint (Docket No. 1); Harm Decl. (Docket No. 13), Exh. 10* (copy of 60-day notice letter). *See also 16 U.S.C. § 1540(g)(1)* (providing for ESA citizen suit enforcement actions).

The Complaint alleged violations of ESA Sections 7 and 9 against the U.S. Forest Service, and ESA Section 9 "take" claims against the Jones Defendants, relating to Jones' diversions on Forest Service lands out of Otter Creek. *Complaint (Docket No. 1).* As the Complaint noted, the then-existing diversion used by the Jones Defendants was a crude device that blocked the stream, obstructed fish passage in the stream, and allowed "entrainment" of bull trout into the unscreened Otter Creek ditch. *Id.*

In March 2001, Plaintiffs filed a Motion for Preliminary Injunction and supporting evidentiary and expert materials, which requested that the Court enjoin further Otter Creek diversions until ESA consultation was completed and the diversion was modernized with a headgate and fish screen so as to prevent entrainment, obstruction of fish passage, and stream dewatering. *Docket Nos. 9-15.*

In response, the Forest Service Defendants prepared an April 2001 Biological Assessment, which confirmed that the existing Otter Creek diversion needed to be modernized with a headgate and fish screen, to prevent future harm to bull trout as described in Plaintiffs' injunction motion. *See Rauch Decl. (Docket No. 21), Exh. 10.* Plaintiffs then settled with the Forest Service, which paid Plaintiffs $6,000 in attorney fees and costs. *Docket No. 28. See also Declaration of Laurence ("Laird") J. Lucas In Support of Plaintiffs' Motion For Award Of*

BRIEF IN SUPPORT OF MOTION FOR ATTORNEY FEES AND EXPENSES -- 3

*Reasonable Attorney Fees and Litigation Expenses (Docket No. 86), ¶ 30* (hereafter, *"First Lucas Fees Decl."*).

In contrast to the Forest Service, the Jones Defendants **denied** from the beginning of this case that the old Otter Creek diversion posed any threat to bull trout.  They initially took this position in their Answer, filed in February 2001.  *See Docket No. 3*.  In May 2001, they opposed Plaintiffs' preliminary injunction motion, including with an affidavit from Verl Jones asserting that he had a right to continue diverting using the old unscreened Otter Creek diversion structure and that it caused no harm to bull trout.  *See Docket Nos. 22-24*.

After filing these materials, the Jones Defendants then appeared to become more reasonable – they entered into a Stipulation with Plaintiffs that they would not divert water from Otter Creek in 2001 without installation of a fish screen.  *Docket Nos. 29-30*.  Yet just weeks later, the Jones Defendants attempted to go back on that Stipulation, asserting they intended to begin Otter Creek diversions using the old diversion device, based on an affidavit from Mike Larkin asserting that no fish screen was needed.  *Docket No. 33*.  Plaintiffs thus were forced to seek a Temporary Restraining Order to prevent diversions in 2001 *(Docket Nos. 34-35)*, which this Court granted on July 13, 2001 and set a preliminary injunction hearing date in August.  *Docket No. 39*.

Plaintiffs then engaged in substantial preparation for the preliminary injunction hearing, including by filing reply expert declarations from Ms. Thea responding to Mr. Larkin's affidavit, *see First Lucas Fees Declaration, ¶¶ 32, 39 & Exhs. 1-3* – but then the Jones Defendants avoided a hearing by entering into a second Stipulation with Plaintiffs, again agreeing not to undertake any diversions during 2001.  *Docket Nos. 42-43*.

BRIEF IN SUPPORT OF MOTION FOR ATTORNEY FEES AND EXPENSES -- 4

In short, Plaintiffs prevailed in winning injunctive relief during 2001 and preventing the Jones Defendants from continuing to divert out of Otter Creek without a headgate and fish screen, thus protecting bull trout from harm that year.

**Summary Judgment and Permanent Injunction Proceedings in 2002.**

Plaintiffs did not actively pursue the litigation during fall 2001 and spring 2002, in the hope that consultation over the diversion between the Forest Service and U.S. Fish Wildlife Service would resolve the matter. *First Lucas Fee Declaration, ¶¶ 32, 35 & 39*. Moreover, as a result of the litigation, Fish and Wildlife Service paid the Jones Defendants $20,000 **not** to divert from Otter Creek in 2002, such that Plaintiffs did not need to seek an injunction against further diversions that year. *Id.*

But when the Court issued a notice that the case would be dismissed for lack of prosecution in spring 2002, Plaintiffs sought to resolve their claims on the merits, by filing a Motion for Summary Judgment and Permanent Injunction in June 2002. *Docket Nos. 46-50*. That motion was largely based on the record already before the Court from the preliminary injunction motions in spring/summer 2001. *Id.; First Lucas Fees Declaration, ¶¶ 32, 35*.

During this period, Plaintiffs engaged in only limited discovery with Defendants and otherwise sought to resolve this case as efficiently and expeditiously as possible. *See First Lucas Fees Declaration,¶¶ 2-7, 12, 27, 32-39 & Exhs. 1-3*. Indeed, Plaintiffs made repeated efforts to settle their claims against the Jones Defendants (as they had done with the Forest Service Defendants), by offering to dismiss their claims if the Jones Defendants would stipulate not to further divert from Otter Creek until a new diversion is installed in compliance with the requirements established through the ESA Section 7 consultation process, so as to avoid further harm to bull trout from entrainment, obstruction of fish passage or dewatering. *Id., ¶¶ 36-37 &*

BRIEF IN SUPPORT OF MOTION FOR ATTORNEY FEES AND EXPENSES -- 5

*Exh. 5* (description of settlement offers and copies of settlement correspondence).

Rather than settle, the Jones Defendants continued to insist that no fish screen was needed, because the old diversion posed no problem for bull trout. *Docket Nos. 58-69, 76-78.* They even escalated the litigation through a Motion in Limine and supporting Declaration of Greg Schildwachter from the Idaho Office of Species Conservation, which alleged that Plaintiffs' expert Karen Thea's testimony was not "scientific." *See Docket Nos. 58-59.* This forced Plaintiffs to take the deposition of Mr. Schildwachter (the only deposition taken in this case), who had not been previously disclosed by the Jones Defendants; and further, Plaintiffs were forced to engage their own expert "peer reviewers" to assess Ms. Thea's testimony and rebut Mr. Schildwachter's criticisms. *See Docket Nos. 60, 70-75* (Plaintiffs' opposition to motion in limine)*; First Lucas Fees Declaration, ¶¶ 24, 27, 32-38 & Exh. 1.* Hiring these peer reviewers and responding to the motion in limine required substantial additional attorney time and expenses of Plaintiffs; as did the need to reply to the Jones Defendants' summary judgment opposition, and to prepare for and attend the Court hearing on October 23, 2002. *Id.*

The Court issued its Memorandum Decision and Judgment on November 14, 2002, finding for Plaintiffs on all major issues, entering summary judgment on Plaintiffs' ESA citizen suit claims against the Jones Defendants, and entering a permanent injunction barring the Jones Defendants from further operating the Otter Creek diversion until modernized with a headgate and fish screen, as requested by Plaintiffs, "to ensure flows below the diversion are sufficient for migrating and spawning bull trout." *Docket Nos. 80-81*.

**2003 Proceedings.**

After the Court entered summary judgment and a permanent injunction, Plaintiffs filed a motion for award of fees and expenses for the litigation in November 2002. *Docket Nos. 82-86*.

BRIEF IN SUPPORT OF MOTION FOR ATTORNEY FEES AND EXPENSES -- 6

In the same time, the Jones Defendants filed a Motion to Alter or Amend Judgment, which simply repeated their prior arguments that the old Otter Creek diversion was not a threat to bull trout. *Docket Nos. 87-88.* This required further attorney work by Plaintiffs to oppose, which was time not included in Plaintiffs' prior fees motion. *See Second Lucas Fees Declaration (filed herewith), Exh. 1.*

Notably, the Jones Defendants did **not** seek a stay of the permanent injunction issued by the Court with their motion to reconsider, *see Docket Nos. 82-86.*; and hence the injunction remained in place during 2003, barring diversions from Otter Creek – meaning that for a third year in a row, bull trout were protected from adverse harms in Otter Creek, due to this litigation.

On September 29, 2003, the Court issued an Amended Judgment, which denied the Jones Defendants' motion to alter/amend in all material respects; and granted Plaintiffs' motion for attorney fees and litigation expenses, in the amount of $35,459.93. *See Docket No. 96.* The Court expressly found the "hourly rates charged by counsel for plaintiffs to be reasonable" and "the total hours expended to be reasonable," and it approved all claimed litigation expenses. *Id.*

On October 24, 2003, the Jones Defendants filed a notice of appeal; and also submitted a motion to stay the judgment pending appeal, or alternatively to waive the requirement for posting a cash bond to secure the fees judgment. *Docket Nos. 97-99.* In these, the Jones Defendants again insisted that they should be allowed to continue diverting using the old diversion structure. *Id.* Plaintiffs responded to the stay motion by noting that they opposed lifting the injunction; but advised that they would not seek to collect on the fees award until the appeal was resolved, if the Jones Defendants would not transfer any of their valuable real estate. *Docket No. 104.* The Court ultimately denied the motion to stay pending appeal, but granted the waiver of a superseadas bond, based on these considerations. *Docket No. 116.*

BRIEF IN SUPPORT OF MOTION FOR ATTORNEY FEES AND EXPENSES -- 7

**Appeal Proceedings.**

The parties sought to resolve their dispute before the Ninth Circuit mediator in the early part of 2004. *Docket Nos. 107-109.* But the Jones Defendants then abruptly terminated those talks, when they brought in new appellate counsel affiliated with the Pacific Legal Foundation. *See Second Lucas Fees Declaration, filed herewith, ¶ 16.* The Jones' appeal was thereafter briefed during the remainder of 2004; and set for argument in February 2005. *Docket No. 110.*

Notably, the Jones Defendants' new counsel **never** filed any motion for stay of the permanent injunction before the Ninth Circuit. *Second Lucas Fees Decl., ¶ 17.* Thus, the Court's permanent injunction of November 2002 remained in effect during the entire appeal, such that the Jones Defendants did not divert from Otter Creek during either 2003 or 2004.

**Renewed Injunction Motion In 2005.**

In April 2005, the Ninth Circuit issued a short, unpublished decision which reversed the Court's entry of summary judgment, on grounds that there were disputed facts requiring a trial, because Verl Jones and IDFG's Mike Larkin had submitted affidavits asserting that the Otter Creek diversion did not hurt bull trout. *See Docket No. 120.*

But the Ninth Circuit did **not** question the propriety of a permanent injunction to bar continued use of the old Otter Creek diversion under the ESA, if the facts found at trial confirmed the Court's rulings on summary judgment. The Ninth Circuit specifically stated that: "the Joneses should be enjoined to use a fish screen and a head gate in their diversion if there is a reasonably certain imminent threat . . . that the lack of a fish screen or a head gate will kill or injure bull trout or will modify habitat in a way that kills and injures bull trout." *Id., p. 2.*

Upon remand, Plaintiffs thus requested that the Jones Defendants stipulate not to divert from Otter Creek until trial was held in November 2005; or until ESA consultation was

BRIEF IN SUPPORT OF MOTION FOR ATTORNEY FEES AND EXPENSES -- 8

completed and a new fish screen and headgate were installed. *Second Lucas Fees Decl., ¶ 18-19*. When the Jones Defendants would not so stipulate, Plaintiffs filed a Motion for Renewed Injunction on April 26, 2005 – again citing the facts and law already before the Court as demonstrating that Plaintiffs were likely to prevail on their claims at trial, and hence a preliminary injunction was warranted. *Id. & Docket No. 119*.

In their response to the renewed injunction motion, the Jones Defendants (now represented by their prior district court counsel) continued to insist that the old Otter Creek diversion posed no threat of harm to bull trout. *See Docket Nos. 126-128*. But citing an affidavit filed by Mrs. Jones, they also represented to the Court that "**Defendants do not intend to divert water from Otter Creek until a headgate and fish screen are installed.**" *Docket No. 126, p. 3 & Docket No. 128* (emphasis added).

Although the Jones Defendants had refused to enter into a Stipulation to this effect previously with Plaintiffs, this representation to the Court that the Jones Defendants would not divert from Otter Creek without a headgate or fish screen appeared adequate to avoid needless litigation over further injunction proceedings, so Plaintiffs thus withdrew their Motion for Renewed Injunction. *See Docket No. 131; Second Lucas Fees Decl., ¶¶ 19-21*.

As a result of the Renewed Injunction Motion, however, it bears underscoring that Plaintiffs succeeding in preventing the Jones Defendants from diverting from Otter Creek during 2005 using the old diversion device – meaning that Otter Creek bull trout were protected from harm during 2005, just as they have been since the case was filed in 2000. *Id.*

### Further 2005 Proceedings And Motion To Dismiss.

The Court set the matter for trial in November 2005, and entered deadlines for completion of discovery and disclosure of expert reports. *Docket Nos. 132-34.*

BRIEF IN SUPPORT OF MOTION FOR ATTORNEY FEES AND EXPENSES -- 9

On September 8, 2005, the Jones Defendants filed a Declaration of Steve Yundt as their expert report in compliance with the pre-trial deadlines. *Docket No. 135.* Mr. Yundt stated that he is a fisheries biologist previously employed by the Idaho Office of Species Conservation (which likewise employed Dr. Schildwachter), but is now with the Idaho Department of Fish and Game (where the Jones Defendants' prior affiant, Mike Larkin, also worked). *Id.* As with these other state employees, the Jones Defendants did not pay Mr. Yundt – instead, his time and services were funded by Idaho taxpayers. *Id.*

Mr. Yundt continued the Jones Defendants' long-standing denial that the archaic Otter Creek diversion posed any harm to bull trout. *Id.* His declaration essentially ignored the Forest Service's own BA finding that a fish screen and headgate were needed to prevent entrainment of bull trout and allow fish passage instream. *Id.*

Shortly after Mr. Yundt filed his declaration, the U.S. Fish and Wildlife Service issued its final September 2005 Biological Opinion on the Otter Creek diversion. *See Smith Affidavit, Exh. 1 (Docket No. 139).* That Biological Opinion mandates installation of a specified fish screen and headgate on the Otter Creek diversion, as a result of which the diversion will no longer obstruct bull trout movement in Otter Creek, and there will be no future risk of bull trout entrainment in the ditch; and it reduces the amount of Otter Creek diversions **by half** in order to leave more water in Otter Creek for bull trout passage, while imposing other management restrictions and requirements. Together, these measures are intended to prevent any "take" of bull trout from future operation of the diversion, as the Biological Opinion discusses. *See Smith Aff., Exh. 1, pp. 1-8, 18-24.*

After receiving Mr. Yundt's declaration and the final Biological Opinion – which thoroughly contradicts Mr. Yundt – Plaintffs sought yet again to resolve this case by settlement

with the Jones Defendants. *See Second Lucas Fees Decl., ¶¶ 22-25 & Exh. 3*. Plaintiffs offered to dismiss if the Jones Defendants would stipulate that they would adhere to the Biological Opinion's requirements, and not divert from Otter Creek until the required fish screen and headgate were installed. *Id.* Yet as before, the Jones Defendants refused to enter into any stipulation or settlement along these lines. *Id.*

As a result, Plaintiffs were forced to prepare a reply expert report from Ms. Thea, responding to Mr. Yundt and taking into account the final Biological Opinion. *See Docket No. 136.* This additional expert time cost Plaintiffs another $1050 in litigation expenses for this matter. *See Second Lucas Fees Decl., ¶ 12*.

It appears that the Jones Defendants willfully imposed these additional – and unnecessary – litigation costs upon Plaintiffs, as part of their tactics intended to demonize and belittle Plaintiffs in the media. *See Second Lucas Fees Decl., ¶ 23 & Exh. 2.* Reflecting these tactics, the Jones Defendants' appellate counsel issued a press release denouncing Plaintiffs as "terrorists" and even claiming that this Court issued the permanent injunction "on the basis of mere allegations alone." *Id.*

Moreover, even though Plaintiffs submitted a signed stipulation to the Jones Defendants on October 14, 2005, proposing dismissal of the case based on both parties agreeing to accept the terms of the September 2005 Biological Opinion, *see Second Lucas Decl., Exh. 2,* the Jones Defendants would not sign anything to this effect. Yet just a short time later, the Jones Defendants filed their own Motion to Dismiss on October 27, 2005. *Docket Nos. 137-142.* They argued that the case should be dismissed as moot, asserting to the Court – including through a sworn declaration of Mrs. Jones – that they would not challenge the requirements of the September 2005 Biological Opinion, and would not undertake further diversions from Otter

BRIEF IN SUPPORT OF MOTION FOR ATTORNEY FEES AND EXPENSES -- 11

Creek until the required headgate and fish screen are installed and they have received approval from the Forest Service. *Id.*

Plaintiffs responded that they did **not** oppose the Motion to Dismiss, based on these representations – since the Jones Defendants were now taking the very position that Plaintiffs had repeatedly asked them to take. *See Docket No. 143.* Further, as Plaintiffs noted, the September 2005 Biological Opinion confirms their showing that a fish screen and headgate are needed to prevent bull trout entrainment in the ditch and to allow bull trout passage instream. *Id.* Because the Jones Defendants were asserting that they would adhere to all requirements of the Biological Opinion, Plaintiffs thus achieved the relief sought all along in this case, and hence their claims could be dismissed. *Id.* Plaintiffs expressly noted, however, their intent to seek recovery of fees and litigation expenses under the ESA. *Id., footnote 1.*

The Court then entered Judgment on November 10, 2005, finally terminating this litigation. *Docket No. 145.* Plaintiffs now timely seek recovery of their reasonable attorney fees and litigation expenses under the ESA and F.R.Civ.P. 54.

## ARGUMENT

### I.    PLAINTIFFS ARE ENTITLED TO AN AWARD OF REASONABLE ATTORNEY FEES AND LITIGATION EXPENSES UNDER THE ESA

The ESA provides that in citizen suit enforcement actions, such as this, the Court "may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines that such award is appropriate." *16 U.S.C. § 1540(g)(4).*

The purpose of the ESA citizen suit provision is to encourage enforcement of the ESA's requirement by "private attorneys-general." *Bennett v. Spear, 520 U.S. 154, 165 (1997).* As the Supreme Court has explained, "Congress provided fee awards to ensure that there would be lawyers available to plaintiffs who could not otherwise afford counsel, so that these plaintiffs

BRIEF IN SUPPORT OF MOTION FOR ATTORNEY FEES AND EXPENSES -- 12

could fulfill their role in the federal enforcement scheme as 'private attorneys general,' vindicating the public interest." *Evans v. Jeff D., 475 U.S. 717, 748-49 (1986).* "Congress made clear that citizen groups are not to be treated as nuisances or troublemakers, but rather as welcomed participants in the vindication of environmental interests." *Friends of the Earth v. Consolidated Rail Corp., 768 F.2d 57, 63 (2d Cir. 1987).*

Under federal fee shifting statutes, such as the ESA here, a plaintiff "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Hensley v. Eckerhart, 461 U.S. 424, 429 (1938).* As the U.S. Supreme Court has held, in construing a similar Clean Air Act provision, such fee awards are "appropriate" when plaintiffs have had "some degree of success on the merits." *Ruckelshaus v. Sierra Club, 463 U.S. 680, 694 (1983).* This "appropriate" standard thus "expand[s] the class of parties eligible for fee awards from prevailing parties to *partially prevailing* parties – parties achieving *some success*, even if not major success." *Ruckelshaus, 463 U.S. at 688* (emphasis in original).

The Ninth Circuit recently followed *Ruckelshaus* in ruling that an award of fees is appropriate under the ESA even where a case is dismissed as moot, if the plaintiff has obtained at least partial success in obtaining relief sought by the litigation. *See Association of California Water Agencies v. Evans, 386 F.3d 879, 884-888 (9th Cir. 2004).* There the Ninth Circuit held that certain water users were entitled to recover fees under the ESA, even though their case was dismissed based on the results of other similar litigation – and even though fees were also awarded in the other litigation. *Id.*

The *California Water Agencies* decision explained that when a plaintiff does not win a final judgment on the merits, "a two-part test determines whether that plaintiff nonetheless 'prevailed' for the purpose of receiving attorney fees." *Id., at 885-86.* "First, in a factual

BRIEF IN SUPPORT OF MOTION FOR ATTORNEY FEES AND EXPENSES -- 13

inquiry, the District Court must determine what the lawsuit sought to accomplish and then determine whether it was accomplished by means of the suit. Plaintiffs need only have received some of the benefits they sought in the suit." *Id.* Under the second factor, the "court must determine that the benefit achieved was required by law and was not a gratuitous act of the defendant." *Id., n. 3*.

## II. PLAINTIFFS WERE THE PREVAILING PARTIES.

As the facts above establish, Plaintiffs meet these tests to qualify as prevailing parties for purposes of a fee award under the ESA.

Again, Plaintiffs' goal throughout this litigation was to prevent the Jones Defendants from continuing to use the archaic Otter Creek diversion, until it underwent ESA consultation and was modernized with a fish screen and headgate to prevent entrainment in the ditch, while allowing fish passage instream.

Plaintiffs have fully achieved that goal. The Jones Defendants have **not** diverted from Otter Creek since this case was filed in December 2000, as a result of the preliminary injunction proceedings in 2001, the permanent injunction entered in November 2002, and the renewed injunction filed in April 2005. As a result, bull trout have not been threatened with any of the harms posed by the old Otter Creek diversion, including entrainment in the ditch or obstruction of their passage instream. And the September 2005 Biological Opinion indicates that this respite has helped recover the Otter Creek bull trout population.

Moreover, Plaintiffs have succeeded not only in preventing diversions using the old Otter Creek structure, but they have succeeded in forcing the Jones Defendants to accept new requirements – imposed under the September 2005 Biological Opinion – that a modern headgate and fish screen must be installed, reducing their diversion rate by half to leave more water

instream, and other management requirements that eliminate any risk of entrainment while facilitating fish movement up and down Otter Creek past the diversion point.

Thus, Plaintiffs have fully met the first test of achieving their goals, as articulated in *California Water Users, supra*. Indeed, their victories in forcing the Jones Defendants to stop utilizing the historic Otter Creek diversion through the preliminary injunction motions and subsequent stipulations and court orders, in spring/summer 2001, alone constitute sufficient success in altering the status quo and serving the purposes of the ESA to warrant a fee award. *See, e.g., LSO Ltd v. Stroh*, 205 F.3d 1146, 1161 (9th Cir. 2001) (awarding fees because "the TRO in this case did more than preserve the status quo" and "altered" the defendants' planned course of action); *Williams v. Alioto*, 625 F.2d 845, 847-48 (9th Cir. 1980) ("by obtaining the preliminary injunction appellees 'prevailed on the merits of at least some of (their) claims"); *Watson v. County of Riverside*, 300 F.3d 1092, 1096 (9th Cir. 2002) (entry of a preliminary injunction carries "all the 'judicial imprimatur' necessary to satisfy" the "prevailing party" requirements of some fee shifting statutes).

And there can be no serious dispute that Plaintiffs have met the second test under *California Water Agencies* as well. The Jones Defendants have not gratuitously agreed to forego Otter Creek diversions during the last 5 years, or accept the requirements of the September 2005 Biological Opinion for modernizing the Otter Creek diversion. They have insisted throughout this case that the old diversion posed no threat to bull trout, and they had every right to continue using it. It was this litigation, and this litigation only, that forced them to stop diverting and accept the new requirements.

Accordingly, Plaintiffs are entitled to an award of fees under the ESA citizen suit provision, and the tests set forth in *Ruckleshaus* and *California Water Agencies*.

BRIEF IN SUPPORT OF MOTION FOR ATTORNEY FEES AND EXPENSES -- 15

### III. THE REQUESTED AWARD IS REASONABLE.

#### A. Plaintiffs' Requested Fees Are Reasonable.

Since Plaintiffs are the prevailing parties and their success serves the goals and purposes of the ESA, they are presumptively entitled to an award of attorneys fees based on the reasonable hours their attorneys spent in prosecuting the claims against the Jones Defendants, multiplied by a reasonable hourly rate. *Hensley v. Eckerhart*, 461 U.S. at 433-34; *Ferland v. Conrad Credit Corp.*, 244 F.3d 1145 (9th Cir. 2001). This "lodestar" calculation presumptively results in a reasonable fee award. *Id.*

As noted above, the Court previously found reasonable the requested number of hours and hourly rates for which a fee award was sought, thus awarding Plaintiffs $37,336 – which the Court reduced by $6,000 to reflect the Forest Service's fee payment, thus resulting in a net fee award of $31,336. *See Docket No. 96; Second Lucas Fees Decl., ¶ 11.*

Plaintiffs are now seeking recovery of those same fees, plus an additional 50.2 hours spent by lead counsel Mr. Lucas since the prior fee motion – mostly for time on district court proceedings in 2005 upon remand – at a rate of $225/hour. *See Second Lucas Fees Decl., ¶¶ 6-11 & Exh. 1.* Plaintiffs are **not** seeking recovery for any time spent on the Ninth Circuit appeal, or on post-judgment discovery and other side issues. *Id.* This additional attorney time equals $11,295. *Id.* When added to the prior fee award, the total attorney fee sought by Plaintiffs here is thus $42,631. *Id.*

It is reasonable for Plaintiffs to recover these fees, first, because these attorney services were necessary to secure Plaintiffs' victories in this case, and thereby further the purposes of the ESA. *See California Water Users, supra; Carson-Truckee Water Conser. Dist. v. Secretary of the Interior*, 748 F.2d 523, 525 (9th Cir. 1984). Plaintiffs specifically won injunctive relief at

BRIEF IN SUPPORT OF MOTION FOR ATTORNEY FEES AND EXPENSES -- 16

several stages in this process; and the evidence and legal work relating to that injunctive relief was identical to the presentation made upon summary judgment.  Again, the Court has already found these hours to be reasonable.

Second, there is no reason to discard or reduce these hours based upon the Ninth Circuit's reversal of summary judgment.  The Ninth Circuit did **not** rule that this Court somehow applied the wrong legal standard, or that it would be inappropriate to enjoin the Otter Creek diversion under the ESA's legal standards.  Instead, the Ninth Circuit simply held that disputed facts precluded entry of summary judgment; and it reversed for trial.  Where the Jones Defendants did not even seek a stay of the permanent injunction pending appeal from the Ninth Circuit, and they continued to abide by the permanent injunction during the entire appeal period, Plaintiffs obtained the results sought during this period of the litigation, and there is no basis for reducing their attorney hours during the pre-appeal litigation before this Court now.

Third, it is also reasonable for Plaintiffs to seek recovery of their attorney time during 2005, after the case was remanded.  As explained above and in the Second Lucas Fee Declaration, those hours are not extensive; and focused on trying to resolve the case informally while preventing the Jones Defendants from operating the Otter Creek diversion using the old structure, without a headgate and fish screen.  Again, it bears reiterating that the Jones Defendants consistently **refused** any stipulation or settlement along these lines, forcing Plaintiffs to file the Renewed Injunction Motion and to prepare for trial (including preparation of the Reply Thea Declaration) – yet after Plaintiffs expended these efforts, the Jones Defendants then capitulated by advising the Court in their response filings that they would not divert until a headgate and fish screen were installed.  *See Second Lucas Fees Decl., ¶¶ 15-26 & Exh. 3.*

In short, the Jones Defendants adopted the tactics that delayed this litigation and forced

BRIEF IN SUPPORT OF MOTION FOR ATTORNEY FEES AND EXPENSES -- 17

Plaintiffs to spend more time on it, than they should have been required to do. Accordingly, the full amount of the requested fee award is reasonable.

      **B.**      **Plaintiffs' Requested Litigation Expenses Are Reasonable.**

Plaintiffs also seek an award of expert witness fees and other litigation expenses reasonably incurred in prosecuting their claims against the Jones Defendants in this matter, including the $4,123.90 in expenses previously awarded by the Court, and an additional $1050 in expert fees incurred in 2005 in response to the Yundt declaration. *See Second Lucas Fees Declaration, ¶ 12-13*.

These expenses were all reasonable and necessary to the successful prosecution of Plaintiffs' claims; and in fact understate actual expenses by omitting additional travel, telecommunications, copying, and other costs that were actually incurred in this matter. *See First Lucas Fees Decl., ¶¶ 24-29*. Again, there is no reason to reduce the expenses previously awarded by the Court, since they were integral to Plaintiffs' success in this case. It also appropriate to award the full expenses incurred by Plaintiffs, in light of the Jones Defendants' litigation tactics that imposed additional costs on Plaintiffs, including the $1050 paid for a reply expert declaration in October 2005.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully pray that the Court award them under the ESA the requested attorney fees of $42,631, plus expenses of $5,173.93, thus totaling $47,804.93. *See Second Lucas Fees Decl., ¶ 14*.

Dated:  November 16, 2005                Respectfully submitted,

                                                        ___/s/ Laird J. Lucas_____
                                                        Laurence ("Laird") J. Lucas
                                                        Attorney for Plaintiffs